# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Blanche M. Manning | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 03 CR 84 | **DATE** | August 24, 2004 |
| **CASE TITLE** | *United States v. Davis* | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
    ☐ FRCP4(m)  ☐ General Rule 21  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] For the reasons set forth in the attached Memorandum and Order, Defendant Davis' Motion for Downward Departure is GRANTED. It is so ordered.

(11) ☐ [For further detail see order on the reverse side of the original minute order.]

| | No notices required, advised in open court. | | | | Document Number |
|---|---|---|---|---|---|
| | No notices required. | | number of notices | | |
| ✓ | Notices mailed by judge's staff. | | AUG 25 2004 | | |
| | Notified counsel by telephone. | U.S. DISTRICT COURT CLERK | date docketed | | 51 |
| | Docketing to mail notices. | | | | |
| | Mail AO 450 form. | 2004 AUG 24 PM 4:23 | docketing deputy initials | | |
| | Copy to judge/magistrate judge. | | | | |
| RTS | courtroom deputy's initials | FILED-CCB | date mailed notice | | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | | |

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| | ) | Hon. Blanche M. Manning |
| v. | ) | |
| | ) | 03 CR 84 |
| KIM DAVIS | ) | |

## MEMORANDUM AND ORDER

Defendant Kim Davis pled guilty to one count of conspiracy to possess with intent to distribute in excess of one kilogram of PCP, in violation of 21 U.S.C. § 846. The present matter comes before this Court on Davis' motion for a downward departure at sentencing.[1]

## BACKGROUND[2]

Kim Davis' life is a tragic example of the vicious circle which illegal drugs reap on our society. Davis, who is now 34 years old, was born to a heroin addicted mother and a father who was incarcerated most of Davis' life. This combination unfortunately led to a "very unstable household" in which Davis and her sister were neglected. Not surprisingly, Davis dropped out of school at an early age and began abusing alcohol and drugs, eventually becoming addicted to PCP, crack cocaine, and alcohol. Davis's mother reported that Davis exhibited "suicidal behavior over the years," including an attempt to "jump from a moving vehicle" when she was 16 years old.

---

[1] This Memorandum and Order supplements this Court's in-court rulings on August 12 and 24, 2004, on the issues of mental capacity and duress.

[2] The facts in the Background section and throughout this opinion are taken from the Presentence Investigation Report ("PSR") which was prepared by the United States Probation Office ("Probation"), the parties' submission, including two expert reports submitted by Davis, and the testimony presented at the sentencing hearing on August 13, 2004.



Davis currently has five children – ages 5, 7, 10, 11, and 16. According to Davis, since learning of her arrest and pending incarceration, the children have developed severe behavioral and emotional problems. Davis is the sole support and care giver for her children. Because there are not any relatives or friends to care for her children, if Davis is incarcerated, they would most likely go into foster care and conceivably be separated from each other. Additionally, Davis states that she "has the responsibility for caring for [her mother], [who] suffered a massive heart attack in October of 2003.

Her two "long-term" relationships with men resulted in abuse. Her relationship with Earl Dobbs was described as "extremely abusive and destructive." Dobbs, who was 20 years older than Davis, forced Davis to sell drugs by beating her and threatening to leave her and her children if she refused.[3] During the time of the instant conspiracy, Dobbs financially supported Davis and her children.

In anticipation of sentencing, Davis' attorney arranged for two experts to examine her.[4] The first expert to examine Davis was Calvin Young, a licensed clinical therapist. Mr. Young diagnosed Davis as suffering from a Dependant Personality Disorder and Bipolar Disorder. According to Mr. Young, Davis' decisions to stay with Dobbs and sell drugs would have been substantially affected by her Dependant Personality Disorder because her condition resulted in her having "an excessive need to be taken care of by others," and taking actions, without regard to the consequences, to please "significant others, such as former lovers."

---

[3] Dobbs died in 2002, from complications resulting from his drug addiction.

[4] Although the Court offered the Government an extension of time to retain its own expert, it did not offer any expert testimony to rebut Davis' experts.

Dr. Miles, a board certified psychiatrist, also examined Davis. After construing several psychological tests administered to Davis, Dr. Miles found that Davis has "long term issues with her cognitive capacity" and "possible brain impairment" which could result in "problems with attention, memory, organization, reasoning and problem solving." Based on this diagnosis, Dr. Miles opined that "Davis' impaired cognitive capacity combined with a severe lack of resources greatly influenced the decisions she made which led to [her] current legal issue."

Despite her troubled upbringing, drug and alcohol abuse, and mental illness, with the exception of the instant matter, Davis has steered clear of any major legal troubles. In her plea agreement, Davis admitted that from June 1999 until January 2002, she, Christine Williams, and others conspired to possess in excess of one kilogram of PCP with the intent to distribute it, in violation of 21 U.S.C. § 846. Davis also admitted that in the fall of 2001 until January 2002, she and others purchased "wholesale" quantities of PCP which were resold by Davis and others to "street-level" customers. Davis further admitted that during the course of the conspiracy at least three kilograms of PCP were brought and sold.

After Davis' plea of guilty, Probation completed a PSR for Davis. Probation calculated Davis' total offense level under the 2002 Guidelines as follows:

| | |
|---|---|
| Base Offense Level: (based on Davis' admission in her plea of 3 kilograms of PCP)[5] | 32 |
| Safety Valve Departure: (section 2D1.1(b)(6)) | -2 |

---

[5] Because Davis admitted to possessing at least three kilograms of PCP and waived her right to a jury trial, the determination of her base offense level is unaffected by the Blakely and Booker decisions.

| Adjustment for Acceptance of Responsibility (section 3E1.1(a) and (b)) | -3 |
| Total Offense Level: | 27 |

With a Total Offense Level of 27 and a Criminal History Category of I, the 2002 Guidelines provide for a period of incarceration between 70-87 months. Probation's recommended sentence is 70 months.

## ANALYSIS

Davis seeks a downward departure on the grounds that: (A) an extraordinary family hardship exists; and (B) diminished mental capacity and duress substantially contributed to her illegal conduct. The Court will address each of these contentions in turn but will first discuss this Court's discretion to depart from the Guidelines.

Generally, the sentencing court must impose a sentence falling within the applicable range set forth in the Guidelines. See Koon v. United States, 518 U.S. 81, 85 (1996). The court may, however, depart from the Guideline range if it "finds that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described." 18 U.S.C. § 3553(b). See also U.S.S.G. § 5K2.0; Koon, 518 U.S. at 92. Therefore, "[i]n the absence of a characteristic or circumstance that distinguishes a case as sufficiently atypical to warrant a sentence different from that called for under the guidelines, a sentence outside the guideline range is not authorized." U.S.S.G. § 5K2.0, Comment.

Examining departures from the Guidelines, the Supreme Court in Koon explained that the Sentencing Commission intended "the sentencing courts to treat each guideline as carving out a

'heartland', a set of typical cases embodying the conduct that each guideline describes." Koon, 518 U.S. at 93 (quoting U.S.S.G. ch. 1, pt. A, intro. cmt. 4(b)). The Sentencing Commission, however, "did not adequately take into account cases that are, for one reason or another, unusual." Id. Thus, "[w]hen a court finds an atypical case, one to which a particular guideline linguistically applies but where conduct significantly differs from the norm, the court may consider whether a departure is warranted." U.S.S.G. ch. 1, pt. A, intro. cmt. 4(b). Therefore, before a sentencing court is permitted to depart from the Guidelines, the court must find that the case is "unusual" enough for it to fall outside the "heartland" of cases covered in the applicable guideline. See Koon, 518 U.S. at 93.

The Court in Koon set forth the following factors that sentencing courts should use in determining whether a departure from the applicable guidelines range is appropriate:

1) What features of this case, potentially, take it outside the Guidelines' "heartland" and make of it a special, or unusual, case?
2) Has the Commission forbidden departures based on those features?
3) If not, has the Commission encouraged departures based on those features?
4) If not, has the Commission discouraged departures based on those features?

Koon, 518 U.S. at 95. The Court went on to explain the mechanics of applying this framework:

> If the special factor is a forbidden factor, the sentencing court cannot use it as a basis for departure. If the special factor is an encouraged factor, the court is authorized to depart if the applicable Guideline does not already take it into account. If the special factor is a discouraged factor, or an encouraged factor already taken into account by the applicable Guideline, the court should depart only if the factor is present to an exceptional degree or in some other way makes the case different from the ordinary case where the factor is present. If a factor is unmentioned in the Guidelines, the court must, after considering the structure and theory of both relevant individual guidelines and the Guidelines taken as a whole, decide whether it is sufficient to take the case out of the Guidelines heartland. The court must bear in mind the Commission's expectation that departures based on grounds not mentioned in the Guidelines will be highly infrequent.

Id. at 95-96 (citations and internal quotations omitted). The Guidelines seek to "aid the court by identifying some of the factors that the Commission has not been able to take into account fully in formulating the guidelines." U.S.S.G. § 5K2.0. These factors are listed in sections 5K2.1 to 5K2.17.

## A.    Extraordinary Family Circumstances

Courts may grant a downward departure for "extraordinary family circumstances" where the defendant's children or other family members are unusually dependent upon the defendant and could face serious mental or physical problems if separated from the defendant. See United States v. Stefonek, 179 F.3d 1030, 1038 (7th Cir. 1999) (reconsideration of departure based on extraordinary family circumstances was warranted where defendant was a single mother of a 12-year old with learning problems; such reconsideration required a determination of whether child would suffer greater harm than normal child, what care would be available for child while defendant was in prison and whether professional assistance was available for the child); United States v. Owens, 145 F.3d 923, 929 (7th Cir. 1998) (affirming downward departure from imprisonment range of 168-210 months and imposing a sentence of 120 months in crack cocaine possession case; the defendant was primary support for wife and children; family would go on public assistance as a result of defendant's incarceration; defendant spent time every day with brother who suffered from Downs Syndrome); United States v. Gauvin, 173 F.3d 798, 806-08 (10th Cir. 1999) (14-month departure in case involving assault on federal officer with a dangerous weapon; the defendant was a father and supporter of his wife and four young children; wife could barely support family, and she was in danger of losing custody of the children); United States v. Galante, 111 F.3d 1029, 1035-36 (2nd Cir. 1997) (approving 13-level downward

departure in a drug case to time served plus 24 months home detention for a defendant with two young children ages eight and nine; wife and children were uniquely dependent on the defendant because the wife was unable to speak English and could not support the family); United States v. Sclamo, 997 F.2d 970, 973-74 (1st Cir. 1993) (affirming a downward departure where the defendant had developed a special relationship with the young son of a woman with whom he was living who had psychological and behavioral problems, and his psychologist believed there would be a risk of "regression and harm if [the] defendant were incarcerated").

Additionally, many commentators agree that "family responsibility" departures are consistent with, and not contrary to, the Guidelines. See, e.g., Jack B. Weinstein, The Effect of Sentencing on Women, Men, the Family, and the Community, 5 Colum. J. Gender & L. 169, 178 (1996) ("[i]n certain cases, in view of the necessity of maintaining family stability in environments where father role models are few and far between, downward departures from the Guidelines and a search for alternatives to incarceration are a necessity for male defendants"); Jody L. King, Avoiding Gender Bias in Downward Departures for Family Responsibilities Under the Federal Sentencing Guidelines, 1996 Ann. Surv. Am. L. 273, 301 (1996) (suggesting that increased use of departures for family responsibilities is appropriate, but cautioning that "the decision to grant a downward departure for family responsibilities [should] turn[ ] on the need of the defendant's dependents"); Placido G. Gomez, The Struggle Against Unwarranted Uniformity: The Evolution of Federal Sentencing Departures Based on Extraordinary Family Circumstances--The Case of Low-Level Drug Offenders, 21 J. Marshall L. Rev. 77, 90 (1995) (suggesting the use of alternative to incarceration in cases involving low-level drug offenders with extraordinary family responsibilities).

Applying the above principals, Judge Williams, in <u>United States v. Graham</u>, 1998 WL 88885, at * 3-4 (N.D. Ill. Feb. 20, 1998), granted a downward departure based on extraordinary family ties and responsibilities. The defendant in <u>Graham</u> pled guilty to four counts of bank robbery. <u>Id.</u> at *1. Before committing the robberies, the defendant's business was "completely wiped out," and as a result, the defendant was unable to pay for nursing care for his seriously ill wife and began caring for her at their home. <u>Id.</u> After the death of his wife, the defendant suffered a nervous breakdown that led to his drinking heavily and the commission of the bank robberies. <u>Id.</u> Since being arrested, however, the court found that the defendant "has been sober, completely cooperative, and openly remorseful." <u>Id.</u> at 3.

Reviewing decisions where family circumstances were found to be extraordinary, Judge Williams noted that "other courts faced with this question have departed downwards when the defendant was solely responsible for the physical and mental health of a family member." <u>Id.</u> at *4. Reviewing the defendant's circumstances, the court found that the defendant's daughter-in-law and her family had become "very dependent on [the] defendant." <u>Id.</u> at *5. The defendant lived with his son and his wife, who is disabled, and their two children. <u>Id.</u> The defendant cooks, cleans, cares for the daughter-in-law, and generally manages the home. <u>Id.</u> Consequently, Judge Williams found that:

> in light of the tragic circumstances leading up to defendant's involvement in the charged offense and defendant's confession upon his arrest, the court finds that no end will be served by imprisoning defendant for the time prescribed by the guidelines. Based on the factors detailed above and the fact defendant is currently 70 years old, currently sober, and no longer depressed, the court finds that defendant is no longer a threat to the community. Accordingly, the court concludes that [defendant's] family ties and responsibilities take his case outside the Guidelines' heartland and warrant a downward departure.

Id. at *5.[6]

Here, Davis has five children – ages 5, 7, 10, 11, and 16. According to Davis, the children have developed severe emotional and behavioral problems since learning of their mother's arrest and likely incarceration. Unfortunately, these problems are only likely to be exacerbated by her incarceration. Davis, who is on public aid and the sole supporter and care giver of her children, asserts that if sent to prison, there are not any relatives or friends to take care of her children, and thus, they would most likely go into foster care. Additionally, Davis states that she "has the responsibility for caring for [her mother], [who] suffered a massive heart attack in October of 2003.

Given this unique family situation and the fact that Davis does not have any relatives to care for her children while incarcerated, the Court finds that incarceration will detrimentally affect her children much more than the average single mother facing prison. Consequently, this Court finds that extraordinary family circumstances are present here, and therefore, exercises its discretion to depart downward from the Guidelines.

---

[6] The Court notes that in at least two other similar cases, Judge Williams granted a downward departure where she found that the defendant was the primary financial provider for his children, United States v. Strong, 1996 WL 745397 (N.D. Ill. Dec. 23, 1996), and where the incarceration of the defendant would endanger his children's physical and/or mental health. United States v. Jones, 1999 WL 1144910 (N.D. Ill. Dec. 8, 1999).

## B. Diminished Mental Capacity and Duress

Additionally, Davis contends that she is entitled to a departure for diminished capacity and duress during the time of the offense, based on Guideline sections 5K2.13 and 5K2.12.

Section 5K2.13 allows a court to depart below the Guidelines if "the defendant committed the offense while suffering from a significantly reduced mental capacity." "Significantly reduced mental capacity means that the defendant although convicted has a significantly impaired ability to (A) understand the wrongfulness of the behavior compromising the offense or to exercise the power of reason; or (B) control behavior that the defendant knows is wrongful." Guideline section 5K2.13, Comment 1. Additionally, the defendant must show that there is at least "some causal connection between [her] mental condition and [her] criminal conduct." United States v. Dyer, 216 F.3d 568, 571 (7th Cir. 2000).

Section 5K2.12 permits a downward departure:

> If the defendant committed the offense because of serious coercion, blackmail or duress, under circumstances not amounting to a complete defense, the court may decrease the sentence below the applicable guideline range. The extent of the decrease ordinarily should depend on the reasonableness of the defendant's actions, on the proportionality of the defendant's actions to the seriousness of coercion, blackmail, or duress involved, and on the extent to which the conduct would have been less harmful under the circumstances as the defendant believed them to be. Ordinarily coercion will be sufficiently serious to warrant departure only when it involves a threat of physical injury, substantial damage to property or similar injury resulting from the unlawful action of a third party or from a natural emergency.

In United States v. Coleman, 1997 WL 666512, at *4 (N.D. Ill. Oct. 22, 1997), Judge Coar granted a 13 level departure based on a combination of sections 5K2.12 and 13. The defendant in Coleman pled guilty to one count of laundering money for her boyfriend, who was a cocaine dealer. Id. at *1. The defendant was raised by an abusive and neglectful mother, who

often left the children "for long periods of time without food" and beat them when they cried because of hunger. Id. at *2. While still in high school, the defendant began a relationship, which resulted in three children, with an abusive boyfriend who was a cocaine dealer. Id. at *1. The boyfriend would often beat the defendant, particularly when she refused to obey his orders. Id. at *2. Two experts who examined the defendant opined that she suffered from "Dependant Personality Disorder," and would do "almost anything" to maintain the relationship with her abusive boyfriend, regardless of whether such action "was self-destructive." Id. at *3.

In granting a downward departure under sections 5K2.12 and 13, Judge Coar acknowledged that the defendant "could in the abstract, understand that the criminal conduct engaged in was wrong." Id. at *4. Judge Coar, however, found that the relevant issue was whether her mental condition and her boyfriend's abuse "contributed to the commission of the offense." Id. at *5. Based on her Dependent Personality Disorder, her feelings of dependence and worthlessness, and her boyfriend's physical and mental abuse, Judge Coar found that the defendant was "extraordinarily susceptible to [her boyfriend's] criminal direction" and that the extent that these factors "contributed to the offense conduct was substantial." Id. Accordingly, Judge Coar found that the above factors warranted ten level departure under sections 5K2.12 and 13.

Here, Davis' situation is similar to that of the defendant in Coleman in that the combination of her cognitive defect and her abusive boyfriend significantly contributed to her commission of the instant offense. A clinical therapist who examined Davis, diagnosed her with Dependant Personality Disorder and Bipolar Disorder. Both of Davis' parents were heroin addicts. Her father was in prison most of her life. As a result of her parent's addictions, Davis

-11-

spent most of her childhood with her grandmother. By age 13, Davis was using alcohol and marijuana, and cocaine and PCP by 18.[7] She dropped out of high school by the tenth grade.

Her two "long-term" relationships with men resulted in abuse. Her relationship with Earl Dobbs was described as "extremely abusive and destructive." Dobbs, who was 20 years older than Davis, allegedly forced Davis to sell drugs by beating her and threatening to leave her and her children if she refused. At that time, Dobbs financially supported Davis and her children. Dobbs beatings were so severe that Davis miscarried twice after being beaten. Her decision to stay with Dobbs and sell drugs, was significantly related to her Dependant Personality Disorder. The clinical therapist found that Davis' condition resulted in her having "an excessive need to be taken care of by others," and taking actions, without regard to the consequences, to please "significant others, such as former lovers."

Additionally, Dr. Miles found that Davis has "long term issues with her cognitive capacity" and "possible brain impairment" which could result in "problems with attention, memory, organization, reasoning and problem solving." According to Dr. Miles, some of the defects were probably the result of Davis' mother abusing alcohol and drugs while pregnant with Davis. Dr. Miles also concluded that Davis began selling drugs to please Dobbs because "not pleasing him would lead to consequences which were unacceptable." This need to please others even with respect to illegal activity was a behavior that Davis learned very early on based upon her decreased mental capacity and growing up in a home with a mother and other relatives, who were all drug addicts. Based on this diagnosis, Dr. Miles opined that "Davis' impaired cognitive

---

[7] Davis reports that she is now sober and attending NA and AA.

capacity combined with a serve lack of resources greatly influenced the decisions she made which led to [her] current legal issue."

After carefully examining the expert reports and Dr. Miles' testimony, this Court finds that Davis' cognitive defect and influence of her former abusive boyfriend substantially contributed to the behavior which led to the offense for which she is charged here, to the extent that she could not control behavior which she knew to be illegal. Consequently, this Court exercises its discretion to depart downward from the Guidelines.

## CONCLUSION

For the foregoing reasons, Defendant Davis' Motion for Downward Departure is GRANTED. It is so ordered.

ENTER: _____
BLANCHE M. MANNING
U.S. DISTRICT COURT JUDGE

DATE: 8-24-04